**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
ALPHUS COBB,                 :
                             :
          Plaintiff,         :
                             :
v.                           :    Civil No. 3:12-cv-00661(AWT)
                             :
METRO-NORTH RAILROAD CO.,    :
                             :
          Defendant.         :
                             :
-----------------------------x
```

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Alphus Cobb brings this action against defendant
Metro-North Railroad Company ("Metro-North") pursuant to the
Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq.
In his First Cause of Action, Cobb alleges that he was injured
as a result of Metro-North's negligence.  In his Second Cause of
Action, Cobb alleges that Metro-North violated certain Federal
Railroad Administration ("FRA") regulations and therefore is
strictly liable for his injuries.  Metro-North has filed a
motion for summary judgment as to both causes of action.  Cobb
has filed a cross motion for summary judgment as to the Second
Cause of Action.  For the reasons set forth below, Cobb's cross
motion for summary judgment is being denied, and Metro-North's
motion for summary judgment is being denied.

I.    **FACTUAL BACKGROUND**

   A.    **Cobb's Employment and the Incident**

   Cobb has been employed with Metro-North and its predecessor railroads as a Machinist since 1974.  During his shift, Cobb was responsible for conducting daily mechanical inspections of multiple unit ("MU") cars and Genesis Locomotives.  Cobb's regular shift was from midnight to 8:00 a.m., Monday through Friday, in the Bridgeport Yard.

   On May 16, 2009, Cobb was working an overtime shift in the New Haven Yard.  As during his regular shift, Cobb's responsibilities during the overtime shift included conducting on-board inspections of train cars in the New Haven Yard.  Cobb ascended the exterior steps[1] of Genesis Locomotive No. 226, entered the locomotive cab and performed his inspection.  After completing the inspection, Cobb began climbing down the same steps.  He faced the cab door and stepped down one foot at a time, with both hands on the vertical handholds on either side of the ladder.  When Cobb had both feet on the bottom step, he began to lower his left foot to the ground.  Cobb "claims to have felt a pain starting on the right side of his neck and right shoulder, down the center of his back" before his left

---

[1] The court notes that the parties disagree regarding how the steps Cobb ascended and descended should be characterized.  For the purposes of this ruling, the court will refer to the steps Cobb ascended and descended (and the same steps on the other Genesis Locomotives) as "steps."

foot touched the ground.  (Local Rule 56(a)(1) Stmt. ¶ 8).  Cobb did not slip on the step as he was lowering his foot.

Cobb climbed from ground level into rail cars every day he worked in order to conduct on-board inspections.  Specifically, he had conducted on-board inspections of Genesis Locomotives at least once or twice per week since Metro-North acquired them in 1995.  Prior to the incident on May 16, 2009, Cobb had never been involved in any incident involving climbing on or off a Genesis Locomotive, and he had never complained to any supervisor at Metro-North about the height of the steps or handholds on the Genesis Locomotive.

**B.   Genesis Locomotives**

In 1994, Metro-North contracted with General Electric ("GE") to obtain five Genesis Locomotives.  The Genesis Locomotive is a road power locomotive.  At the time Metro-North initially ordered the Genesis Locomotives, the National Railroad Passenger Corporation ("Amtrak") was already using the same locomotives, including in Metro-North territory.  After receiving its first five Genesis Locomotives in 1995, Metro-North obtained an additional 26 Genesis Locomotives between 1998 and 2001.  The locomotive involved in Cobb's incident was received by Metro-North in 2001.

In late 1997, Metro-North learned that an Amtrak conductor had sustained an injury while riding on a Genesis Locomotive.

The conductor had been standing on the lowest step, and when the locomotive traveled around a curve, the conductor's foot was pinched by the traction link, which was located just behind the steps.  After learning of the Amtrak incident, Metro-North expressed concern to GE about the clearance between the steps and the traction link.  GE agreed to review the concerns with its Safety Specialist "to confirm FRA compliance."  (Id. at ¶ 28).  After reviewing the concerns and conducting an investigation, GE informed Metro-North in October 1997 that the steps were FRA compliant.  GE also told Metro-North that Amtrak would attempt to prevent similar injuries by placing a decal near the steps that read: "KEEP OFF LADDER WHEN LOCOMOTIVE IS IN MOTION."  (Id. at ¶ 29).

In April 1998, Metro-North requested that GE raise the lowest step of the Genesis Locomotive steps by four inches and that GE adjust the other steps accordingly.  Because of third rail clearance issues, lowering the steps instead of raising them was not an option.  When the height of the steps was raised, the vertical handholds were not modified and, instead, were left at their original height.  Prior to the modification, the lowest step was measured at 17.78 inches above the rail; after the modification, the lowest step measures at approximately 21.75 inches above the top of the rail.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether

there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law."  <u>Id.</u>  As the Court observed in <u>Anderson</u>: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  <u>Id.</u> Thus, only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary

judgment.   See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in his or its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine

issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, who must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067,
1072 (2d Cir. 1993) (quotation marks, citations and emphasis
omitted).  Furthermore, "unsupported allegations do not create a
material issue of fact."  Weinstock, 224 F.3d at 41.  If the
nonmovant fails to meet this burden, summary judgment should be
granted.

## III. DISCUSSION

### A.  Second Cause of Action- Strict Liability

"The Safety Appliance Acts impose an absolute duty on
railroad carriers to maintain the required safety equipment on
their vehicles."  Beissel v. Pittsburgh & Lake Erie R.R. Co.,
801 F.2d 143, 145 (3d Cir. 1986) (citing Lilly v. Grand Trunk W.
R.R. Co., 317 U.S. 481, 485-86 (1943)).  "The SAA also
encompasses regulations enacted by the Federal Railroad
Administration."  Woods v. Union Pac. R.R. Co., 162 Cal. App.
4th 571, 577 (Cal. Ct. App. 2008) (citing McGinn v. Burlington

N. R.R. Co., 102 F.3d 295, 299 (7th Cir. 1996)).  The
regulations, set forth in Part 231 of Title 49 of the Code of
Federal Regulations, describe the technical specifications for
the various safety appliances required on 27 different types of
rail cars.  See 49 C.F.R. § 231, et seq.

"Although the SAA does not create an independent cause of
action, an employee injured as a result of a violation thereof
may commence an action under FELA."  Woodard v. CSX Transp.,
Inc., No. 1:10-cv-753, 2012 WL 431190, *1 (N.D.N.Y. Feb. 10,
2012).  Thus, "the Safety Appliance Acts provide the basis for
the claim, and the FELA provides the remedy."  Beissel, 801 F.2d
at 145.  "[A] [SAA] violation is per se negligence in a FELA
suit.  In other words, the injured employee has to show only
that the railroad violated the [SAA], and the railroad is
strictly liable for any injury resulting from the violation."
Phillips v. CSX Transp., Inc., 190 F.3d 285, 288 (4th Cir.
1999).

In his Second Cause of Action, Cobb claims that the height
of the steps on the Genesis Locomotive did not comply with FRA
regulations governing locomotive safety appliances, and
therefore Metro-North is strictly liable for his injuries.

### 1.  *Car of Nearest Approximate Type*

The parties agree that the Genesis Locomotive is not one of
the types of rail cars that is specifically described in Part

231, but is instead a "car of special construction" as set forth in 49 C.F.R. § 231.18.  Section 231.18 states:

> Cars of construction not covered specifically in the foregoing sections in this part, relative to handholds, sill steps, ladders, hand brakes and running boards may be considered as of special construction, but shall have, as nearly as possible, the same complement of handholds, sill steps, ladders, hand brakes, and running boards as are required for cars of the nearest approximate type.

49 C.F.R. § 231.18.  Thus, to determine whether the Genesis Locomotive complies with the FRA regulations, the court must determine: (1) which type of rail car is the car "of the nearest approximate type" and (2) whether the Genesis Locomotive has "as nearly as possible" the same complement of safety appliances as the car of the nearest approximate type.

### i.   Issue of Fact or Law

As an initial matter, Cobb argues that which car is of the nearest approximate type and whether the Genesis Locomotive has as nearly as possible the same complement of safety appliances is a question of law.  In support of this contention, Cobb cites various cases which stand for the proposition that which safety appliance regulation applies to the Genesis Locomotive is a question of law.  However, that proposition does not extend to the conclusion that which car is of the nearest approximate type and whether the Genesis Locomotive complied as nearly as possible is a question of law.

The parties do not dispute that the Genesis Locomotive is a
car of special construction and that 49 C.F.R. § 231.18 is the
regulation with which it must comply.  Thus, which car is of the
nearest approximate type and whether the Genesis Locomotive has
as nearly as possible the same complement of safety appliances
is a question of whether the Genesis Locomotive complies with 49
C.F.R. § 231.18.  Compliance with the applicable regulation is
ordinarily an issue of fact for the jury to determine.  See
Gasden v. Port Auth. Trans-Hudson Corp., 140 F.3d 207, 210 (2d
Cir. 1998) (whether the rail car in question complied with the
regulation that it have conveniently located handholds or
footboards was "within the purview of a jury's fact-finding
ability . . . ."); Woods, 162 Cal. App. 4th at 578 ("[T]he
question of whether a particular safety appliance complies with
the SAA generally is a question of fact to be decided by the
trier of fact . . . ." (emphasis in original)); Foreman v. BNSF
Ry. Co., No. C10-1758Z, 2013 WL 5945803, *1 (W.D. Wash. Nov. 6,
2013) (stating that whether a safety appliance installed on a
rail car was "safe" was a question of fact for the jury).

Because the question of which car is of the nearest
approximate type to the Genesis Locomotive and whether the
Genesis Locomotive has as nearly as possible the same complement
of safety appliances is an issue of fact, if the court

determines that there is a genuine issue of material fact as to either issue, the dispute will be for a jury to resolve.

ii.  Expert Testimony

Metro-North contends that expert testimony is required in order to determine which car is of the nearest approximate type and whether the Genesis Locomotive has as nearly as possible the same complement of safety devices as the car of the nearest approximate type.  It contends that

> [a]ccurately identifying the "cars of the nearest approximate type" requires a type-by-type comparison of the Genesis Locomotive to the 27 types of cars specifically described in the FRA safety appliance regulations. Such a comparison, in turn, requires an understanding and analysis of the technical features of the Genesis Locomotive, as well as of the 27 other types of cars. This analysis is well beyond the average knowledge of a layperson . . . ."

(Def.'s Mem. Supp. Mot. Summ. J. (Doc. No. 55) at 16).

When discussing rail cars that fall into the category of cars of special construction and how courts determine the car of nearest approximate type are limited, the court in Foreman did not need to determine the car of nearest approximate type because the parties were in agreement as to which car was of the nearest approximate type to the car of special construction at issue.  See Foreman, 2013 WL 5945803 at *1.  In two other cases, the court concluded, without explanation, which car was of the nearest approximate type.  See Beissel, 801 F.2d at 146-47; Toadvine v. Norfolk S. Ry. Co., 129 F.3d 1265, *2 (6th Cir.

1997).  In another case, the court did not determine which car
was of the nearest approximate type, but instead concluded that
the safety appliance at issue was essentially an "additional
safety appliance[]", and the FRA regulations did not prohibit
additional safety appliances.  See Woods, 162 Cal. App. 4th at
579.

The court has identified only one case in which a court
actually determined which car was of the nearest approximate
type to a car of special construction and explained its
reasoning.  In Feldman v. CSX Transp., Inc., 821 N.Y.S.2d 85,
90-92 (N.Y. App. Div. 2006), the court determined which car was
of the nearest approximate type to a car of special
construction.  In arriving at its decision that "a box or other
house car with roof hatches" was the car of nearest approximate
type, the court credited and relied on a FRA letter ruling.  Id.
at 91.  Although the court noted that the letter ruling was not
entitled to Chevron deference, the court stated that "the FRA's
reasoning was valid and thoroughly considered" and that the
interpretation was "not irrational or inconsistent with the
regulations."  Id.  Thus, the court relied on the FRA's
interpretation.[2]

---

[2] Metro-North argues that Feldman did not "resolv[e] a dispute between the
parties as to which 'cars of nearest approximate type' applied to a
particular car of special construction" because "the court simply cited a
case which previously had identified the car of nearest approximate type."
(Def.'s Mem. Supp. Mot. Summ. J. (Doc. No. 55) at 15).  While Feldman did

These cases do not lead the court to conclude that expert testimony is necessary to assist the finder of fact in determining which is the car of nearest approximate type, and therefore with which car it must have as nearly as possible the same complement of safety appliances.  Metro-North cites, in support of its position that expert testimony is necessary, other cases in which courts have found expert testimony necessary in the context of questions about train car design under FELA.  (See Def.'s Mem. Supp. Mot. Summ. J. (Doc. No. 55) at 17-18).  Additionally, Metro-North cites Federal Rule of Evidence 702 and the accompanying Advisory Committee Notes for the proposition that expert testimony is commonly used where an evaluation of facts is difficult or impossible without scientific, technical, or specialized knowledge.

However, the court is not persuaded that expert testimony is necessary to determine the car of nearest approximate type. Evaluating train car design is a materially different task than determining for a particular item what is the nearest approximate type.  Also, while the testimony of the defendant's expert may prove to be helpful to the jury here (and, in fact, is required to be under Rule 702) because of the expert's specialized knowledge, it does not follow that expert testimony

cite a case for the proposition that hopper cars resemble box cars, the court went on to discuss the FRA's letter ruling and why it found the letter ruling to be persuasive.

is required.  It is not established as a matter of law that an expert is required for the question at issue, and the jury here may find the evidence proffered by the plaintiff more persuasive than that from the defendant's expert.

### iii. Applicable Regulation

Because expert testimony is not required to determine which car is of the nearest approximate type to the Genesis Locomotive, the court turns to whether there is a genuine issue of material fact as to which car is of the nearest approximate type.  Cobb contends that "[s]team locomotives used in road service," as set forth in 49 C.F.R. § 231.15, are the cars of nearest approximate type; Metro-North contends that the cars of nearest approximate type are "[b]ox and other house cars without roof hatches or placed in service after October 1, 1966," as set forth in 49 C.F.R. § 231.27.

Cobb argues that steam locomotives used in road service are the cars of nearest approximate type to the Genesis Locomotive because the Genesis Locomotive is a "road locomotive" that is not used in switching service and does not have corner stairways.[3]  Because the FRA Office of Railroad Safety "Motive Power and Equipment Compliance Manual" (the "MP&E Manual")

---

[3] The argument that the Genesis Locomotive is not used in switching service and does not have corner stairways is meant to support Cobb's position that the car of nearest approximate type is set forth in 49 C.F.R. § 231.15, and not § 231.16 (steam locomotives used in switching service) or § 231.29 (road locomotives with corner stairways).

states that non-steam locomotives are required to have as nearly as possible the same complement of safety appliances as contained in the regulations for steam locomotives, Cobb argues that the regulation that governs steam locomotives used in road service should be applied to the Genesis Locomotive.  However, Cobb does not demonstrate why the fact that the Genesis Locomotive is a road locomotive necessarily leads to the conclusion that a steam locomotive used in road service is the car of nearest approximate type aside from the fact that they are both used in road service.

Additionally, Cobb cites to a letter from Ron Hynes ("Hynes"), Director of the FRA's Office of Safety Assurance.  In response to a letter from the plaintiff's counsel asking which regulation would apply to the placement of the vertical handholds on the Genesis Locomotive, Hynes states that because the "FRA understands the Genesis 2 type of locomotive to be road power[,] . . . [the] FRA would apply the requirements at 49 C.F.R. § 231.15- *Steam locomotives used in road service*, as the nearest approximate type." (Ex. 10 (Doc. No. 62-10) at 2).  The plaintiff argues that the court should give deference to the letter.

However, in support of its argument that the car of nearest approximate type is a box and other house car without roof hatches or placed in service after October 1, 1966, Metro-North

also cites correspondence between itself and the FRA.  Metro-North's John Hogan ("Hogan") sent an email to John Killoy ("Killoy") at the FRA asking which regulation applies to the distance from the top of the rail to the first step of the ladder on the Genesis Locomotive.  Hogan wrote,

> In the CFR it spells out the height from top of rail to bottom step for a switching locomotive (18 inches). For Tier II it spells out the height of 22 inches from top of rail to first step on ladder.  However- I cannot find details specific to Tier 1.  Does it follow Tier II or is there a section I am missing relative to "Road Locomotives"[?]

(Ex. T (Doc. No. 55-3) at 3).  Killoy passed the question along to Stephen Carullo ("Carullo"), a Railroad Safety Specialist at the FRA, noting that he could not find a regulation addressing Hogan's question.  Carullo responded that the step Hogan asked about "would not be considered a traditional locomotive step and would be considered a sill step.  The sill step requirements are typically 22" preferred and no more than 24" above top of rail." (Ex. T (Doc. No. 55-3) at 2).  Killoy then responded to Hogan that the FRA would apply the regulation for box and other house cars without roof hatches or placed in service after October 1, 1966 found at 49 C.F.R. § 231.27(c)(iii) to the height of sill steps.  (Ex. T (Doc. No. 55-3) at 2).

Additionally, Metro-North points to the report of its expert, Phil Olekszyk ("Olekszyk").  Olekszyk opines that "the sill step tread on Genesis Locomotive #226 [was required] to be

not more than twenty-four (24), and preferably not more than
twenty-two (22) inches above the top of rail." (Exhibit U (Doc.
No. 55-4) at 11). The height of 22" to 24" is the height for
sill steps described in 49 C.F.R. § 231.27(c)(iii). However,
Olekszyk does not give an opinion that box and other house cars
without roof hatches or placed in service after October 1, 1966
are the cars of closest approximate type to the Genesis
Locomotive. Instead, Olekszyk suggests that the car of nearest
approximate type will be different depending on the type of
safety appliance in question.

Thus, there are genuine issues of material fact as to what
car is of the nearest approximate type to the Genesis
Locomotive.[4] Therefore, Cobb's cross motion for summary judgment
is being denied and Metro-North's motion for summary judgment on
this ground is being denied.

### 2. Compliance as Nearly as Possible

Metro-North contends that even if Cobb could establish
which car is of the nearest approximate type to the Genesis
Locomotive, he cannot establish a violation of the applicable
regulation without expert testimony. Section 231.18 requires
that cars of special construction have "as nearly as possible

---

[4] The court notes that the parties dispute whether the step on which Cobb
slipped should be considered a "sill step" or a "pilot sill step." Because a
genuine issue of material fact exists as to which car is of the nearest
approximate type, the court does not reach the issue of whether the step is a
sill step or a pilot sill step.

the same complement of [safety appliances] as are required for cars of the nearest approximate type." (emphasis added).  Thus, Metro-North argues, Cobb needs expert testimony to show that the Genesis Locomotive did not comply as nearly as possible with the car of nearest approximate type.  The court disagrees.

As discussed more fully in section III.A.1, <u>supra</u>, the case law suggests that a finder of fact can determine whether a car complies as nearly as possible in the absence of expert testimony.

In <u>Feldman</u>, the court determined that a "box or other house car with roof hatches" was the car of nearest approximate type to the car of special construction at issue.  821 N.Y.S.2d at 91.  The court then had to determine whether the running boards on the car of special construction complied as nearly as possible with the regulation concerning running boards for box or other house cars with roof hatches.  The regulations provided that, on box or other house cars with roof hatches, running boards were required to be located "[f]ull length of car, center of roof."  49 C.F.R. § 231.1(c)(3).  However, on the car of special construction in question, the running boards were located "along the outside of the center line."  821 N.Y.S.2d at 92.  The court held that the location of the running boards complied as nearly as possible with 49 C.F.R. § 231.1(c)(3). <u>Id.</u> at 92.  The court first noted that the running boards on the

car at issue "[could not] physically be located down the center of the car because the hatches are located down the center of the car." Id. at 91.  The court found persuasive the reasoning in a letter ruling from the FRA which took the position that the car complied as nearly as possible.  The court stated, "[t]he interpretation that such a design complies as nearly as possible with the box car requirements is not irrational or inconsistent with the regulations since center line hatches provide more uniform loading and more consistent balance for the railcars." Id. at 91-92.  Thus the court concluded, without the aid of expert testimony, that the car of special construction complied as nearly as possible with the regulations for the car of nearest approximate type.

The court also finds pertinent dictum in Gasden.  In Gasden, the plaintiff argued that the defendant's rail vehicle did not comply with the requirement in the regulation that it have "[o]ne or more safe and suitable handholds conveniently located."  140 F.3d at 209 (quoting 49 C.F.R. § 231.25).  The plaintiff offered evidence in the form of his deposition testimony and affidavit that the rail vehicle lacked conveniently located handholds and footboards, and the court stated that a determination of whether the handholds and footboards were "conveniently located" was "customarily within the purview of the jury's fact-finding ability."  Id. at 210.

Although Gasden dealt with the question of whether a safety
appliance was "conveniently located," as opposed to whether a
car of special construction complied "as nearly as possible,"
both issues require the finder of fact to reach a conclusion as
to whether a safety appliance complies with the statute.  Thus,
Gasden is instructive here.

In support of its argument that expert testimony is
required, Metro-North cites to various portions of the MP&E
Manual that refer to the need for inspectors to use their
judgment in enforcing the safety appliance regulations.  (See
Def.'s Mem. Supp. Mot. Summ. J. (Doc. No. 55) at 20).  However,
the sections that Metro-North cites refer to inspectors using
their judgment in issuing civil penalty citations, not in
determining whether a safety appliance is in compliance with the
regulations.  For example, the MP&E Manual states,

> In the past, FRA inspectors have taken exception to
> minimal deviations from the measurements specified in
> the Safety Appliance Standards on cars that have been
> in service with the condition for a long period of
> time without any known incident or casualty.  Although
> these civil penalty citations are valid from a
> strictly technical and legal point of view; from a
> common sense point of view, the cars operated safely
> for years, so these minimal deviations do not
> materially reduce safety.

(Ex. 13 (Doc. No. 62-13) at 10-5 (emphasis added)).  Whether a
safety appliance complies with the regulations is a different
question than whether a civil penalty citation should be issued

by the FRA for non-compliance.  It is in the issuance of civil penalty citations that the MP&E Manual directs inspectors to rely on their professional experience and judgment.

Therefore, Metro-North's motion for summary judgment on the ground that Cobb has not disclosed an expert is being denied.

### 3.  *Preclusion*

Metro-North argues that because the Genesis Locomotive complies with the FRA standards, Cobb's FELA claim in the Second Cause of Action is precluded.  However, because there exist genuine issues of material fact as to whether the Genesis Locomotive complied as nearly as possible with the regulation for the car of nearest approximate type, as well as with respect to which car is of the nearest approximate type to the Genesis Locomotive, the court does not reach the issue of whether Cobb's FELA claim would be precluded because the Genesis Locomotive was in compliance with the FRA regulations.  Therefore, Metro-North's motion for summary judgment on this ground is being denied.

### B.   First Cause of Action- Negligence

As with the FELA claim in the Second Cause of Action, Metro-North argues that Cobb's FELA claim in the First Cause of Action is precluded because the Genesis Locomotive is in compliance with the applicable FRA regulation.  For the reasons set forth with regard to the Second Cause of Action, Metro-

North's motion for summary judgment as to the First Cause of Action is being denied.[5]

**IV.   CONCLUSION**

For the reasons set forth above, Metro-North's Motion for Summary Judgment (Doc. No. 53) is hereby DENIED, and Cobb's Cross Motion for Summary Judgment (Doc. No. 64) is hereby DENIED.

It is so ordered.

Dated this 29th day of August, 2014, at Hartford, Connecticut.

                                        /s/
                              _____
                                 Alvin W. Thompson
                              United States District Judge

---

[5] In his memorandum in opposition to Metro-North's motion for summary judgment and in support of his cross motion for summary judgment, Cobb discusses in depth the evidence that supports his negligence claim in the First Cause of Action.  However, because Metro-North only moved for summary judgment as to the First Cause of Action on the ground that it is precluded because the Genesis Locomotive was in compliance with the FRA regulations, and Cobb himself did not move for summary judgment on the First Cause of Action, the court does not address the facts and arguments Cobb makes in that section of his memorandum.